# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

RICHARD J. WYDEVEN,

        **Plaintiff,**

        **v.**　　　　　　　　　　　　　　**Case No. 22-CV-1163**

MARTIN J. O'MALLEY,
Commissioner of Social Security[1],

        **Defendant.**

## DECISION AND ORDER

      Richard J. Wydeven seeks judicial review of the final decision of the Commissioner of the Social Security Administration denying his Title II application for a period of disability and disability insurance benefits. For the reasons explained below, the Commissioner's decision is affirmed, and the case is dismissed.

## BACKGROUND

      On July 14, 2019, Wydeven filed a Title II application for a period of disability and disability insurance benefits alleging disability beginning on July 1, 2018 due to weakness, pain, and numbness in the legs; difficulty walking; arthritis; dizzy spells/fainting; gastro-intestinal issues and gastro-intestinal surgery; back pain; alcoholism; and depression. (Tr. 293.) Wydeven's date last insured is September 30, 2018. (Tr. 1357.) Wydeven's claim was denied initially on April 15, 2019 and upon reconsideration on August 26, 2019. (Tr. 1352.) Wydeven filed a request for a hearing, and a telephone hearing was held before

---

[1] The Court has changed the caption to reflect Martin J. O'Malley's recent appointment as Commissioner of Social Security.

Administrative Law Judge ("ALJ") Guila Parker on May 5, 2020. (Tr. 43–63.) Wydeven, represented by counsel, testified, as did Adolph Cwik, a vocational expert ("VE"). (*Id.*)

In a written decision issued June 2, 2020, ALJ Parker found that through Wydeven's date last insured of September 30, 2018, there were no medical signs or laboratory findings to substantiate the existence of a medically determinable impairment. (Tr. 36–37.) Thus, ALJ Parker found Wydeven was not disabled from July 1, 2018 through September 30, 2018. (*Id.*) The Appeals Council denied Wydeven's request for review (Tr. 1–7), and Wydeven filed a complaint in this court on December 24, 2020, Case No. 20-CV-1902 (E.D. Wis.) (Tr. 1334– 35). The parties jointly moved to remand the case for further proceedings and on July 27, 2021, United States District Judge William C. Griesbach remanded the case. (Tr. 1336.)

The Appeals Council issued an order on August 27, 2021. (Tr. 1341.) The Appeals Council noted that while the ALJ was correct that Wydeven sought no treatment between his alleged onset date of July 1, 2018 and his date last insured of September 30, 2018, medical evidence existed in the record from shortly after the date last insured that suggested Wydeven did have a medically determinable impairment during the relevant period, such as November 2018 imaging showing degeneration in the spine and a November 2018 trip to the emergency room presenting with bilateral leg pain and substantial weight loss "in the last couple months." (*Id.*) The Appeals Council further noted the ALJ failed to adequately address relevant evidence from prior to the onset date, as well as the opinions of the State Agency physicians. (Tr. 1342–43.) The ALJ was instructed on remand to give further consideration to the severity of Wydeven's impairments, the prior administrative medical findings, Wydeven's past relevant work, and, if warranted, to obtain supplemental evidence. (Tr. 1343.)

2

Upon remand, the case was returned to ALJ Parker, who held an additional telephone hearing on January 12, 2022. (Tr. 1260–93.) Wydeven, again represented by counsel, testified at the hearing, as did VE Sarah Holmes (*Id.*) ALJ Parker issued a new decision on February 18, 2022. (Tr. 1352–68.) In this new decision, ALJ Parker found that Wydeven had the severe impairment of colon mass with weight loss. (Tr. 1357.) The ALJ found that Wydeven did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. pt. 404, subpt. P, app. 1 (the "Listings"). (Tr. 1360.) ALJ Parker found that through Wydeven's date last insured, he had the residual functional capacity ("RFC") to perform the full range of medium work as defined in 20 C.F.R. § 404.1567(c). (Tr. 1360–67.) The ALJ found that through his date last insured, Wydeven was capable of performing his past relevant work as a shipping and receiving clerk, liquor establishment manager, and bartender. (Tr. 1367.) As such, ALJ Parker again found Wydeven was not disabled from his onset date of July 1, 2018 through his date last insured, September 30, 2018. (Tr. 1367.) The Appeals Council again denied review (Tr. 1248–50), making the ALJ's decision the Commissioner's final decision. Wydeven now appeals the February 18, 2022 denial of benefits.

## DISCUSSION

### 1. *Applicable Legal Standards*

The Commissioner's final decision will be upheld if the ALJ applied the correct legal standards and supported his decision with substantial evidence. 42 U.S.C. § 405(g); *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011). Substantial evidence is not conclusive evidence; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir. 2010) (internal quotation and citation

3

omitted). Although a decision denying benefits need not discuss every piece of evidence, remand is appropriate when an ALJ fails to provide adequate support for the conclusions drawn. *Jelinek*, 662 F.3d at 811. The ALJ must provide a "logical bridge" between the evidence and conclusions. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ is also expected to follow the SSA's rulings and regulations in making a determination. Failure to do so, unless the error is harmless, requires reversal. *Prochaska v. Barnhart*, 454 F.3d 731, 736–37 (7th Cir. 2006). In reviewing the entire record, the court does not substitute its judgment for that of the Commissioner by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Finally, judicial review is limited to the rationales offered by the ALJ. *Shauger v. Astrue*, 675 F.3d 690, 697 (7th Cir. 2012) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Campbell v. Astrue*, 627 F.3d 299, 307 (7th Cir. 2010)).

2. *Application to this Case*

Although Wydeven's administrative record contains nearly a decade of medical treatment, the time relevant to this case is the narrow three-month period between July 1, 2018 (his alleged onset date) and his date last insured, September 30, 2018. Wydeven applied for disability insurance benefits; as such, he must prove that he was disabled by September 30, 2018, known as his "date last insured"—the date when he exhausted his earned quarters of coverage. *See Parker v. Astrue*, 597 F.3d 920, 924 (7th Cir. 2010) (citing 42 U.S.C. § 423(c); 20 C.F.R. § 404.140). While "medical evidence from a time subsequent to a certain period is relevant to a determination of a claimant's condition during that period," *Halvorsen v. Heckler*, 743 F.2d 1221, 1225 (7th Cir. 1984), it is relevant only "to the extent that it corroborates or supports the evidence from the relevant period," *Blom v. Barnhart*, 363 F. Supp. 2d 1041, 1059

4

(E.D. Wis. 2005). Wydeven acknowledges that he did not treat during the relevant three-month period; thus, whether records from outside the relevant period illuminate Wydeven's condition during the relevant time is paramount in this case.

### 2.1 Medical Evidence

Records from as early as May 2011 demonstrate Wydeven's history of medical issues, including lower extremity pain. On May 25, 2011, Wydeven presented to the emergency room with right posterior foot and ankle pain lasting two days, making it difficult to bear weight and necessitating the use of a walker. (Tr. 505.) Imaging taken of the right foot and ankle showed degenerative joint disease in the ankle. (*Id.*) Wydeven was discharged with a prescription for pain medication. (Tr. 505–06.) In October 2012, Wydeven again presented to the emergency room, this time with left foot pain, although Wydeven could fully bear weight and was able to ambulate with moderate difficulty. (Tr. 502.) Wydeven stated that the symptoms occurred gradually over the past three days and that he has "experienced similar episodes in the past, a few times." (Tr. 502–03.) The records indicate a history of gout. (Tr. 503.)

In October 2013, Wydeven presented to the emergency room with complaints of breathing difficulty. (Tr. 492.) Wydeven stated that shortness of breath symptoms began the prior week and worsened, prompting his trip to the emergency room. (Tr. 493.) Wydeven acknowledged smoking a pack of cigarettes a day, often every day (Tr. 501), and the provider suspected the dyspnea was related to developed COPD as he felt much better after bronchodilator treatment (Tr. 495).

Approximately two years later, in August 2015, Wydeven presented to the emergency room again with complaints of right foot pain. (Tr. 482.) Wydeven reported that the pain

began several days prior and felt like "his last gout attack, which was about 3 years ago." (*Id.*) The record indicates that Wydeven was walking and climbing stairs more than normal of late. (*Id.*) Imaging showed moderate to severe first metatarsophalangeal degenerative joint disease. (Tr. 400.) Wydeven was discharged with instructions to return if symptoms worsened or persisted. (Tr. 484.) A CT scan of his abdomen and pelvis taken in October 2015 also noted a degenerative change to the lumbar region. (Tr. 397.)

Wydeven returned to the emergency room again approximately two years later, in July 2017, complaining of leg and foot pain lasting the prior two days. (Tr. 478–79.) Wydeven reported experiencing tingling in the left foot and pain in the right foot. (Tr. 479.) He described his right foot pain as similar to his history of gout flare-ups. (*Id.*) While Wydeven reported having sore bilateral legs, he also noted that he "walks quite a bit." (*Id.*) Wydeven was treated for gout and told to follow-up with his primary care provider. (Tr. 480.) While the records noted that Wydeven had "no neuro deficit," he was instructed to follow-up with neurology for possible EMG testing if the tingling continued. (*Id.*)

Wydeven did not treat again until after his date last insured, returning to the emergency room on November 28, 2018, complaining of bilateral leg pain and weakness that had "been getting progressively worse for the last year and ha[d] been very noticeable for the last 2 months." (Tr. 467.) Wydeven reported that he did not feel safe going down the stairs to do laundry or getting in the shower because of the weakness. (Tr. 468.) Wydeven reported losing 40 pounds in the last couple of months despite not changing his diet or habits. (*Id.*) Wydeven admitted smoking roughly a pack of cigarettes a day and drinking approximately ten beers three times a week. (*Id.*) Wydeven stated that his last colonoscopy was approximately five years prior and at that time he was given the option of "a bowel resection

or to take his chances" and "he chose to take his chances." (*Id.*) Wydeven further reported having dizziness. (*Id.*) Upon physical examination, it was noted that Wydeven appeared alert, awake, and comfortable, but emaciated and frail. (Tr. 469.) His motor strength was five out of five in all extremities, his sensory was grossly intact, and his gait was slow, but steady. (Tr. 468.) Wydeven was given magnesium and experienced moderate improvement in his leg weakness and pain. (Tr. 470.) It was recommended that Wydeven follow-up with a colonoscopy. (*Id.*)

On December 13, 2018, Wydeven treated with medical resident Eric Uting, DO (under the supervision of Dr. Alice Boshoven), to establish care following the November 2018 emergency room visit. (Tr. 556–57.) Wydeven reported having progressive whole-body weakness, bilateral leg pain that worsens with sitting or lying, and dizziness "over the past few months." (Tr. 557.) Wydeven stated he lost 60 pounds over the last year, with 40 pounds of it in the past couple of months. (*Id.*) Wydeven reported concerns about falling as he lives alone, noting that he had fallen to his knees before. (*Id.*) Wydeven stated having left anterior leg numbness and tingling that "ha[d] been present since July." (*Id.*) Wydeven's ability to exercise had decreased due to his weakness, noting that he used to walk frequently. (*Id.*) Dr. Uting noted that Wydeven drank ten beers three times per week and "ha[d] been doing this for years," smoked a pack of cigarettes per day and "ha[d] done this for the past 40 years," and smoked marijuana once per day. (*Id.*) Dr. Uting stated that Wydeven was "not very interested in changing his lifestyle at this time since he reports a lot of stress recently." (*Id.*) Upon physical examination, Wydeven's range of motion, reflexes, and coordination were normal with no cranial nerve deficit; however, he exhibited abnormal muscle tone (4/5 to hip flexors and extensors bilaterally). (Tr. 558.) Dr. Uting also recommended a colonoscopy. (*Id.*)

7

Two days later, on December 15, 2018, Wydeven presented to the emergency room with concerns for dizziness and fainting. (Tr. 464.) Wydeven reported that he was walking in his home when he became dizzy and lightheaded and passed out. (*Id.*) Wydeven stated that "for the last few months, he has been feeling weak and like his legs are going out" and lost 40 pounds since July. (*Id.*) Wydeven was hospitalized until December 20. (Tr. 432.) While hospitalized, Wydeven underwent a colonoscopy, which showed three colonic masses. (Tr. 429.) A colon resection was performed on December 18 without complication. (*Id.*) Physical examination upon discharge showed sensation of the bilateral lower extremities mildly diminished to light touch in the left anterior lateral thigh, 4/5 strength of the bilateral lower extremities to hip flexion, plantar flexion, and dorsiflexion, but that his strength had improved since prior exams. (Tr. 430.) The providers state that Wydeven's syncope was likely secondary to dehydration and mild anemia and that his strength was improving each day and he was able to ambulate the previous day without difficulty. (Tr. 433.)

Wydeven returned to the emergency room approximately one week after discharge, complaining of increased weakness and post-surgical pain. (Tr. 417.) Wydeven stated that his increased weakness was making it difficult to get around his house and to get to the bathroom. (Tr. 418.) Upon physical examination, Wydeven's cranial nerves were grossly intact, motor strength was 5/5 in all extremities, sensory was grossly intact, and his gait was normal. (*Id.*) Wydeven was treated and discharged the same day. (Tr. 420.)

On January 2, 2019, Wydeven presented to the emergency room after falling while consuming alcohol and marijuana. (Tr. 405.) The records indicate that Wydeven was intoxicated upon arrival at the hospital and required additional treatment time to become clinically sober. (Tr. 404.) Wydeven complained of neck pain and head injury from the fall;

thus, multiple imaging studies were conducted. (Tr. 405.) While CTs did not show evidence of acute traumatic abnormality (Tr. 406–407), a CT of his head showed diffuse brain parenchymal volume loss and some areas of subcortical white matter hypodensity (Tr. 385). A CT of the lumbar spine showed multilevel lumbar spondylosis, including bilateral facet arthropathy at multiple levels; diffuse disc bulge causing mild spinal canal narrowing and mild bilateral neural foraminal narrowing at multiple levels; and diffuse disc bulge causing severe spinal canal narrowing and from moderate to severe neural foraminal narrowing at multiple levels. (Tr. 380–81.) A CT of both the thoracic spine and the cervical spine showed multilevel degenerative disc disease. (Tr. 382–83.) Wydeven also had multilevel uncovertebral and facet arthropathy causing neural foraminal narrowing in the cervical spine. (Tr. 383.) Wydeven was instructed to follow-up with his primary care provider. (Tr. 407.)

Wydeven treated with Dr. Uting in follow-up on January 7, 2019. (Tr. 551.) While the record notes that Wydeven's weakness and fall on January 2 was "most likely secondary to alcohol use," it states that Wydeven also likely had some underlying weakness due to his weight loss and noted that Wydeven had been using a walker at home as he was scared of falling. (Tr. 552.) Dr. Uting noted that after discharge from the hospital Wydeven was "set up with home PT, but then refused this," stating that "it was difficult to set up times that would work for him and he does not really believe in physical therapy working." (*Id.*) Wydeven continued to complain of worsening bilateral leg pain in June 2019, stating that pain in the bilateral calves, anterior thighs, and knees "has been worsening over the past few months." (Tr. 1017.) Wydeven told Dr. Uting that he was trying to walk almost every day, but the pain made it difficult to get even the 100 yard walk to the bus stop. (*Id.*) Wydeven displayed abnormal muscle tone and generalized weakness on physical examination. (Tr. 1019.)

9

A CT of the lumbar spine was performed on June 18, 2019. (Tr. 1013.) Using the January 2, 2019 image in comparison, Wydeven had edematous endplate changes present at the L5-S1 level and to a lesser degree at the L4-5 level "which are likely pain generators in this patient. This most likely represents sequelae of degeneration." (Tr. 1013–14.) Wydeven sought treatment with a nurse practitioner in neurosurgery, APNP Billie Sturgeon, on August 27, 2019. (Tr. 1222.) Sturgeon noted that Wydeven had chronic low back and leg pain, with "low back pain on and off throughout the years but cannot state when the leg pain started." (*Id.*) Wydeven reported numbness and tingling in the left leg, weak knees after walking, and changes in gait. (*Id.*) Upon physical examination, Wydeven's gait was wide-based and unsteady and he was unable to tiptoe, heel walk, and tandem gait secondary to balance. (Tr. 1223.) His strength in the upper and lower extremities was fully intact except for right finger interosseous. (*Id.*) Wydeven's muscle tone and sensory examination was within normal limits in all extremities. (*Id.*) Sturgeon noted the recent imaging of the lumbar spine showing degenerative changes resulting in bilateral foraminal narrowing at L5-S1 and recommended further imaging, physical therapy, and meloxicam. (Tr. 1224.) An MRI of the cervical spine was performed on September 4, 2019, showing degenerative anterolisthesis with moderate central narrowing, left facet arthropathy and arthritis, and mild central and bilateral moderate foraminal narrowing due to disc degeneration and uncinate spurring. (Tr. 1226.)

Wydeven treated with Dr. Uting in February 2020 for left neck pain and Dr. Uting noted that while Wydeven was instructed to perform physical therapy and take meloxicam for his low back pain, Wydeven never followed through with physical therapy because he "does not feel this will benefit him." (Tr. 1229.) Wydeven had normal range of motion upon physical examination, but some generalized weakness. (Tr. 1230.) In April 2020, Dr. Uting

again recommended physical therapy and noted that Wydeven "is now more willing to proceed with this." (Tr. 1572.) While Wydeven attended one physical therapy session in April 2020 and it was recommended that he attend sessions one to two times per week (Tr. 1636), Wydeven contacted the clinic later the same day to cancel his remaining sessions stating he was not interested in further treatment (Tr. 1640). Wydeven was again hospitalized for several days in July 2020 after experiencing another syncopal episode in his home after drinking "his normal six to eight glasses of wine beginning around 3 a.m. and ending around 8 a.m." after getting up to use the bathroom. (Tr. 1661.) Additional imaging was taken subsequent to this fall, and a CT of the cervical spine showed advanced multilevel degenerative changes to the cervical spine, progression of anterolisthesis of C3 relative to C4, possibly related to facet degeneration. (*Id.*)

### 2.2 Medical Opinions

Wydeven's RFC was assessed by two State Agency physicians at the initial and reconsideration levels in April and August 2019, respectively. At the initial level, Dr. Marc Young opined that Wydeven was currently capable of performing medium work with postural and environmental limitations. (Tr. 89–91.) Dr. Young opined, however, that as of the date last insured, Wydeven was capable of performing medium work with no further limitations. (Tr. 75–76.) In so finding, Dr. Young noted that prior to Wydeven's date last insured, there was a "notable gap" in medical records between mid-2017 and December 2018. (Tr. 76.) As to the weakness, pain, and numbness in the legs and difficulty walking, Dr. Young noted that prior to the date last insured, Wydeven's gait was consistently reported as normal with no gross motor deficits and with the exception of intermittent gout flares, the records noted Wydeven only sought treatment one to two times per year. (*Id.*)

11

At the reconsideration level, State Agency physician Dr. Marie Turner opined that from November 1, 2018 to the present (August 2019), Wydeven was capable of light or sedentary work[2] with postural and environmental limitations. (Tr. 110–13.) However, as of the date last insured, Dr. Turner opined Wydeven was capable of medium work with no further restrictions. (Tr. 109–10.)

Wydeven's treating physician Dr. Uting opined on May 29, 2020 that Wydeven was capable of walking only 400 feet without rest or severe pain; could sit no more than two hours at one time; could stand only five minutes at one time; could stand/walk less than two hours total; could sit about two hours total; could occasionally lift less than ten pounds; rarely lift ten pounds; and never lift above ten pounds. (Tr. 11–13.) Dr. Uting also opined limitations in reaching, handling, and fingering as well as in twisting, stooping, crouching, climbing stairs, and climbing ladders. (Tr. 13.) However, despite treating Wydeven since December 2018, Dr. Uting stated that the earliest date the description of symptoms and limitations applied was June 1, 2019. (Tr. 11–14.)

### 2.3    Claims of Error

Wydeven argues that in finding him not disabled during the relevant period, the ALJ failed to provide a "logical bridge" between the record evidence and her conclusions and

[2] There is some confusion as to whether Dr. Young opines that Wydeven could perform light or sedentary work as of November 1, 2018. She opines that Wydeven can occasionally lift 20 pounds, frequently lift ten pounds, and sit for a total of six hours in an eight-hour workday; however, she also opines that he can stand and/or walk for a total of five hours. (Tr. 110.) While light work requires lifting no more than 20 pounds at a time while frequently lifting up to ten pounds, it also requires "a good deal of walking or standing." 20 C.F.R. § 404.1567. "Since frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday. Sitting may occur intermittently during the remaining time." SSR 83-10. But again, Dr. Young opined Wydeven could stand and/or walk for a total of *five* hours, not six. And she described the limitation as sedentary while applying the medical-vocational rules. (Tr. 114.) When Wydeven's counsel pointed out this discrepancy during the administrative hearing, the ALJ stated that she considered erosion of the light occupational base and relied on the VE to opine whether the reduction of one hour of stand or walking from the definition of six hours is enough to place Wydeven into sedentary work. (Tr. 1285.) But given the ALJ's sufficient explanation for rejecting this opinion as to Wydeven's condition after the date last insured, I need not resolve this conflict.

failed to properly consider Wydeven's subjective symptoms. Wydeven focuses on the impairments related to his bilateral lower extremities and weight loss.

Wydeven's case is particularly difficult to analyze because the relevant timeframe is a mere three months. Wydeven alleges a disability onset date of July 1, 2018, meaning that he "became unable to work because of [his] disabling condition" on that date. (Tr. 214.) Yet, Wydeven's date last insured is September 30, 2018, three months later. With a claim for disability insurance benefits, Wydeven must show that he was disabled *before* the expiration of his date last insured. Adding to the complication, Wydeven treated only sporadically (i.e., only once or twice per year) from 2011 until 2018 and did not treat at all during the relevant three-month period.

In evaluating the intensity and persistence of one's alleged symptoms, the ALJ considers "all of the available evidence from your medical sources and nonmedical sources about how your symptoms affect you." 20 C.F.R. § 404.1529(a). The ALJ is tasked with determining whether the claimant's symptoms can "reasonably be accepted as consistent with the objective medical evidence and other evidence." *Id.* In evaluating a claimant's symptoms, the regulations instruct the ALJ to consider such factors as daily activities; the location, duration, frequency, and intensity of pain or other symptoms; treatment received; as well as any other factors concerning functional limitations and restrictions due to symptoms. *Id.* § 404.1529(c)(3).

Medical treatment records are undoubtedly one of the most important pieces of evidence the Administration considers when deciding a disability claim. When there are no treatment records for the relevant period, an ALJ can and should consider evidence from outside of the relevant period. *See, e.g.*, *Parker v. Astrue*, 597 F.3d 920, 925 (7th Cir. 2010).

However, this evidence is only relevant to the extent that it corroborates or supports evidence from the relevant period. *See Blom*, 363 F. Supp. 2d at 1059; *see also Eichstadt v. Astrue*, 534 F.3d 663, 667 (7th Cir. 2008) ("But it is evident from the ALJ's decision that she did not 'fail to consider' this evidence, but instead she examined it as required and subsequently concluded that the evidence was irrelevant, because it did not address the correct time period.").

### 2.3.1   Limitations in the Bilateral Lower Extremities

As stated above, ALJ Parker considered Wydeven's claim twice. During her first review in 2020, she relied almost exclusively on Wydeven's lack of treatment during the relevant period in denying his claim, without reference to any records outside the relevant period that could speak to his condition prior to his date last insured. Specifically, she found no evidence of any medically determinable impairment during the relevant period. This was clear error, as found by the Appeals Council, who instructed when remanding the case to consider imaging records from before and after the relevant period that showed degenerative disc and joint disease. Given the nature of degenerative disease being one that worsens over time, the Appeals Council stated that these findings of degeneration "were almost certainly present during the relevant time period, but the ALJ did not discuss the imaging studies in her decision." (Tr. 1341.) ALJ Parker's error at this stage was compounded by the fact that whether a claimant has a medically determinable impairment at step two of the five-step sequential analysis of disability is a "'*de minimis* screening for groundless claims' intended to exclude slight abnormalities that only minimally impact a claimant's basic activities." *O'Connor-Spinner v. Colvin*, 832 F.3d 690, 697 (7th Cir. 2016) (internal citation omitted).

Thus, upon remand, ALJ Parker, following the Appeals Council's Order, considered Wydeven's claims of degenerative joint and disc disease with reference to the imaging studies

completed in 2011, 2015, and 2018 and this time found them to be medically determinable impairments. (Tr. 1359.) She further found, however, that neither impairment was severe. Even so, limitations from both severe and non-severe impairments must be considered in assessing RFC, *see Ray v. Berryhill*, 915 F.3d 486, 492 (7th Cir. 2019), and ALJ Parker did consider the limitations imposed by these non-severe impairments, finding in her 2022 decision that neither of these impairments caused any significant work-related functional limitations during the relevant period and assigned Wydeven an RFC of the full range of medium work. (Tr. 1359–60.) While ALJ Parker continues to rely on Wydeven's lack of medical treatment during the relevant three-month period in denying his claim, this is only one piece of evidence, among many, that she points to in reaching her conclusion.

Recall that the ALJ is looking for consistency between the claimant's alleged symptoms and the record evidence. ALJ Parker does that in this decision. First, she considers the medical records from before and after the relevant period, focusing particularly on what Wydeven agrees provides the most illuminating evidence of his condition during the relevant period—the records coming several months after the date last insured in November and December 2018. During a trip to the emergency room on November 28, 2018 for leg pain and weakness, Wydeven stated that those symptoms had "been getting progressively worse for the last year and has been very noticeable for the last 2 months." (Tr. 467.) Wydeven reported that he did not feel safe going down the stairs to do laundry or get in the shower because of the weakness. (Tr. 468.) Wydeven reported losing 40 pounds in the last couple of months despite not changing his diet or habits. (*Id.*) A CT scan of the chest, abdomen, and pelvis was conducted at this time, showing "degenerative changes of the lower lumbar spine." (Tr. 475.) Wydeven repeated his statements that he had progressive whole-body weakness, bilateral leg

pain, dizziness, and weight loss over the "last few months" to his medical providers in December 2018. (Tr. 464, 557.) Wydeven also testified that he was experiencing these symptoms in the second half of 2018. (Tr. 1273–78.)

Despite these statements, ALJ Parker found that the objective evidence in the form of Wydeven's physical examination findings were regularly normal during the periods both before and after the relevant three months. (Tr. 1359, 1361.) Indeed, while presenting to the emergency room in July 2017 for complaints of leg and foot pain, his extremities were "grossly normal" except for some swelling and tenderness in the medial aspect of the right toes and ball of foot. (Tr. 479–80.) His sensation and strength were normal and his range of motion intact. (Tr. 480.) Similarly, when presenting to the emergency room in November 2018 with leg pain and weakness, Wydeven's motor strength was full in all extremities, his sensory was grossly intact, and his gait was slow, but steady. (Tr. 468.) While Dr. Uting noted on December 13, 2018 that Wydeven had normal range of motion, coordination, and reflexes, his muscle tone was slightly abnormal, at 4/5 to hip flexors and extensors bilaterally. (Tr. 558.) However, two days later, when presenting to the emergency room with weakness and syncope, Wydeven had good muscle tone and movement in all four extremities, motor and sensory grossly intact, and denied any pain or swelling in the extremities. (Tr. 464–65.) These normal findings on physical examination continued (Tr. 418) until approximately June 2019, months after the date last insured, when Wydeven's physical examinations more consistently showed abnormal muscle tone, numbness, and/or gait issues (Tr. 1019, 1223, 1230).

Furthermore, ALJ Parker considered the consistency of Wydeven's statements with the medical imaging evidence. The only imaging in the record prior to the date last insured addressing the spine are images of the pelvis while treating for kidney stones in October 2015

Case 1:22-cv-01163-NJ   Filed 01/08/24   Page 16 of 21   Document 19

that picked up "degenerative change" in the lumbar region. (Tr. 397.) Just after the date last insured, in November 2018, imaging of the chest, abdomen, and pelvis showed "degenerative changes of the lower lumbar spine" (Tr. 475), Wydeven did not undergo any imaging specifically targeting his spine until January 2019, after falling while intoxicated. It was during this imaging that Wydeven's medical providers found multilevel degenerative disc disease. (Tr. 380–84.) And it was not until June 2019, when Wydeven complained of bilateral leg pain "worsening over the past few months" (Tr. 1017) and stiffness in his bilateral hands "for the past 1.5 months" (Tr. 1018) that Dr. Uting ordered further imaging for the specific purpose of exploring complaints of low back pain and numbness (Tr. 1013–16). It was this CT of the lumbar spine that noted, compared to the January imaging, "changes present" which are "likely pain generators in this patient." (Tr. 1013–14.)

While Wydeven accuses ALJ Parker of finding his conditioned worsened after the date last insured while citing no supporting evidence (Pl.'s Br. at 9–10), the ALJ does cite to the January 2019 imaging that prompted Wydeven's diagnosis of degenerative disc disease as well as subsequent imaging showing changes present that likely were causing his pain (Tr. 1359). The ALJ further considered that Wydeven's treating provider, Dr. Uting, specifically assessed his limitations as of June 2019, despite having treated him since December 2018, as evidence rebutting Wydeven's claim that more extreme functional limitations existed prior to the date last insured. (Tr. 1366.)

ALJ Parker also considered the imaging of Wydeven's right foot and ankle from May 2011 and Augusts 2015 which showed degenerative joint disease (Tr. 1359), but also found that despite these findings, Wydeven's physical examinations remained normal and, as late as July 2017, Wydeven reported walking "quite a bit" (Tr. 1363).

17

ALJ Parker considered the opinions of the State Agency physicians, the only medical opinions in the record specifically addressing the relevant time period. At both the initial and reconsideration levels, the State Agency physicians opined that Wydeven could perform the full range of medium work. (Tr. 75–76, 109–10.) In so concluding, Dr. Young, at the initial level, explained that he considered the x-rays of the right foot showing moderate to severe degenerative joint disease, but also considered the normal physical examination findings. (Tr. 76.) He found that despite complaining of weakness, numbness, pain, and difficulty walking, prior to the date last insured, Wydeven's gait was consistently reported as normal with no gross motor deficits. (*Id.*) Dr. Turner at the reconsideration level provides the same analysis. (Tr. 109–10.) The ALJ considered these opinions and found them persuasive, especially given the absence of physical examination findings, imaging, and other supports during the relevant time period. (Tr. 1366.)

Wydeven faults the ALJ for relying on the State Agency physicians' opinions regarding his RFC prior to the date last insured, and yet rejects Dr. Young's opinion that as of November 1, 2018, only 31 days later, Wydeven was capable of only light or sedentary work with postural and environmental limitations (Tr. 110–11). (Pl.'s Br. at 9–10.) But again, ALJ Parker specifically addressed why she found that Wydeven's purported limitations after his date last insured were not the same as those before his date last insured, citing to her earlier discussions regarding Wydeven's lack of treatment and of the medical evidence demonstrating worsening of the degeneration over time. (Tr. 1367.)

Finally, ALJ Parker considered the consistency between Wydeven's alleged symptoms and several other of the regulatory factors, such as Wydeven's treatment and activities of daily living. In explaining that she "fully considered [Wydeven's] statements" from the November

2018 visit (Tr. 1363) that he was experiencing a worsening of pain over the past year, she concluded that despite Wydeven's claim of worsening symptoms, he did not seek treatment at all during this time frame, despite having health insurance. (*Id.*) The ALJ also noted that despite Wydeven's claims of having difficulty getting transportation to appointments, he was able to arrange transportation to shop at the grocery store. (Tr. 1364.) She also found Wydeven's statements of disabling symptoms inconsistent with his statement in July 2017 that he "walks quite a bit" (Tr. 481, 1363) and his ability to tend to his personal care, prepare meals, do dishes, shop for an hour, and do light housecleaning (Tr. 1364).

ALJ Parker also found Wydeven's explanations as to why he failed to seek treatment changed between the 2020 and 2022 hearings. (*Id.*) She found that at the 2020 hearing, Wydeven testified that he did not seek treatment before November 2018 because he was waiting for things to improve on their own; whereas at the 2022 hearing, he testified that he did not seek treatment before November 2018 due to transportation issues or difficulties getting appointments. (*Id.*) And these are not Wydeven's only inconsistent statements in the record. While Wydeven states in November and December of 2018 that the pain and weakness in his lower extremities had been worsening "in the last few months," arguably placing the condition into the relevant three-month period, in June 2019, Wydeven reported to Dr. Uting that he had "noticed bilateral leg pain which has been worsening over the past few months" (Tr. 1017). The June 2019 "past few months" takes the worsening of pain well after the date last insured. And in August 2019, Wydeven told Nurse Practitioner Sturgeon that he has had "low back pain on and off throughout the years but cannot state when the leg pain started" (Tr. 1222). In other words, Wydeven's statements are unclear at best and

19

contradictory at worst as to the actual state of his back and lower extremity pain during the relevant time period.

Thus, while Wydeven argues that the medical records corroborate that he had significant standing and walking limits, weakness, and mobility issues prior to the date last insured and the ALJ failed to explain why Wydeven could engage in medium work despite his alleged lower extremity issues (Pl.'s Br. at 8), Wydeven is incorrect. The record evidence shows normal physical examinations, as well as a lack of reported mobility issues (including being able to walk "quite a bit") before the date last insured, and the ALJ sufficiently explained her rationale. Thus, the ALJ did not err as to Wydeven's lower extremity claims.

### 2.3.2 Limitations Due to Weight Loss

Wydeven further argues that the ALJ erred by finding his 40-pound weight loss to be a severe impairment but failed to provide a stricter RFC to account for the weakness it caused. (Pl.'s Br. at 8–9.) But the ALJ explained that while Wydeven stated that he lost 40 pounds between July and December 2018, given the lack of treatment records, there is no way of verifying when the dramatic weight loss started or its exact cause. (Tr. 1363.) The ALJ further explained why consideration of the subsequent treatment records, such as the records from November 2018, failed to elucidate Wydeven's alleged impairments due to the weight loss during the relevant three-month period. (*Id.*) And she noted that by June 2019, Wydeven had gained back twenty-two pounds. (Tr. 1363–64.) While Wydeven generally asserts that this weight loss caused disabling weakness during the relevant period, there is no evidence to support this contention. As explained above, records from subsequent to the date last insured showed normal strength on physical examination. For these reasons, I do not find the ALJ erred in addressing Wydeven's weight loss during the relevant period.

Case 1:22-cv-01163-NJ   Filed 01/08/24   Page 20 of 21   Document 19

**CONCLUSION**

Wydeven must prove disability during a very narrow timeframe—a three-month period between July 1, 2018 and September 30, 2018. Wydeven argues the ALJ failed to draw a logical bridge between the evidence regarding his alleged issues with his lower extremities and his weight loss and failed to properly evaluate his subjective symptoms. I find the ALJ's decision is supported by substantial evidence and affirm. The case is dismissed.

**ORDER**

**NOW, THEREFORE, IT IS ORDERED** that the Commissioner's decision is **AFFIRMED**.

**IT IS FURTHER ORDERED** that this action is **DISMISSED**. The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 8th day of January, 2024.

BY THE COURT:

_____
NANCY JOSEPH
United States Magistrate Judge